Please rise. This court is now in session. Please be seated. Call the next and last case please. 3-12-0033, People of the State of Illinois, Nathalie's Everett & Leonard v. Patrick Davis, appointed by Jason Strzelecki. Mr. Strzelecki. Thank you. May it please the court and counsel? My name is Jason Strzelecki. I am with the Will County Public Defender's Office and I represent Mr. Patrick Davis in this matter. Just to go through some of the procedural history very briefly, Mr. Davis in this case was charged with the offenses of armed robbery and armed violence. He was found unfit to stand trial. A discharge hearing was held in this case and that hearing resulted in a finding of not not guilty. In other words, he was not acquitted after that hearing. Subsequent to that, pursuant to statute, his treatment period was ultimately extended. Eventually a hearing was held in which he was found to constitute a serious threat to public safety. Pursuant to statute, ultimately the DHS made a request that his treatment plan be modified. Specifically, what they sought was increased past privileges. They were seeking supervised off-grounds privileges to allow him to attend certain off-site activities in various locations, such as a local library and an off-site drug treatment center. Currently, Mr. Davis is in the custody of DHS and specifically he's being treated at Elgin Mental Health Center. Over a year ago, once the DHS made their recommendation for the increased privileges, a hearing was held as to that particular issue. There were two witnesses that testified during that hearing, both on behalf of the defense. First, there was Ms. Sandra Roy, a social worker at DHS who had significant contact with Mr. Davis. She testified that she had been dealing with him for a number of years and generally saw him usually two times a day. She also indicated that she, on a regular basis, received input from other people who dealt with Patrick on a regular basis. She basically indicated that Mr. Davis was a quiet individual. He was attentive, cooperative, obedient, not in any way disruptive, threatening, or aggressive. In short, she indicated that he was a perfect candidate to have these privileges. And moreover, she indicated that these types of privileges would be quite beneficial to Mr. Davis and that they would allow him to move along the continuum, hopefully towards ultimately regaining fitness. She also indicated that she did not believe that Mr. Davis in any way posed any type of flight risk. She indicated that he was certainly not to be considered dangerous. And quite significantly, she indicated that he was not to be considered a threat to anyone's safety. We also heard at that hearing from Dr. Farzana Hussain, who was Mr. Davis' psychiatrist at Elgin. She indicated that at the time of the hearing, she had been dealing with Mr. Davis for approximately a 10-month period and regularly saw him about three times per month. She also indicated that she was in contact with other individuals at DHS who regularly dealt with Mr. Davis. And she essentially reiterated what Ms. Roy had indicated as far as Mr. Davis' overall character and demeanor while at DHS. She indicated that he was compliant with his medications. And quite significantly, she also indicated that he understood the importance of maintaining those medications and keeping up with them. She indicated that he was not experiencing any side effects, was having no behavioral problems, and in all matters was compliant with his treatment program. She, as did Ms. Roy, opined that he was not a threat to public safety and that, in fact, these past privileges would be of significant benefit to Mr. Davis. Ultimately, the judge denied the request for the privileges, citing concerns about the safety protocols that were in place at DHS. Both Dr. Hussain and Ms. Roy indicated that they believed the typical safety protocols in place at DHS were sufficient to prevent there from being any type of threat. They indicated that these procedures and protocols had been in place for quite some time and that, historically, they never had any problems with anybody causing any problems. Nonetheless, the court indicated that it wanted increased safety practices in this particular case. We actually went through the process of contacting DHS to ascertain whether or not, in this particular instance, anything above and beyond their typical safety practices could be put into place. It was indicated that they could not, as a practical matter, put into place any additional safety procedures for this particular case. That was reported back to the trial court. The court also expressed some concerns about some past practices that had been in place at DHS. Namely, the court took issue with the fact that up until a few weeks prior to the time of this hearing, the policy of DHS had been to allow inmates to sleep essentially all day if that was, in fact, what they decided to do. Essentially, there was not a very structured schedule for the inmates during that time period, again, up until just a few weeks before the time of this hearing. I believe it was Ms. Roy who testified to the court, however, that DHS, in essence, recognized the error of their ways. That issue had already been remedied and was certainly nothing to give the court any concern at that point in time, to the extent that it was ever at all relevant to the issue before the court. Essentially, what we're contending is that in this particular case, the court completely ignored all the evidence that was put before it during the course of this hearing. The state presented no evidence whatsoever to contradict anything that was said by either Ms. Roy or by Dr. Hussain. Again, both opined that not only was Mr. Davis a good candidate for these increased privileges, but they were essential for him to make the progress necessary to hopefully one day restore him to fitness. Essentially, the state does take issue with a few arguments that were made in our brief. First of all, the state submits that a defendant's criminal conduct that led to the filing of the petition to commit a defendant is something that should be given weight when determining whether or not that individual poses a significant safety threat at any point in the future. While we do acknowledge that this is, in fact, a relevant factor, it cannot be the sole decisive factor. In fact, I would point out that there certainly is no per se rule in place that has ever been promulgated anywhere that suggests that defendants charged with any particular type of offense can, in fact, be considered to be ineligible for these types of past privileges. Certainly, one thing that's very significant is that both Ms. Roy and Dr. Hussain acknowledged that they were aware of the alleged offenses in this matter. Nonetheless, both opined that that did not change their ultimate opinion as to whether or not he posed any great threat to the public safety, and it certainly did not affect their opinion as to whether or not these past privileges were appropriate and would ultimately be beneficial. You said that the state didn't put on any evidence in the trial court. Did they object? They did object, ultimately, yes, to our request. Okay. The state also indicates and submits that it is ultimately up to the trier of fact to make a determination whether or not these types of privileges should be allowed, and that it is not merely an issue for the doctors who are treating the individual. While we acknowledge that it is, in fact, the case, and we certainly acknowledge that it's the purview of the trier of fact of the court, in this instance, to make that ultimate determination, nonetheless, when we have a situation like we have here, where there is no contradictory evidence, the recommendations of the treating doctors and mental health professionals should be given certainly great weight and cannot simply be ignored, especially for the reasons that were set forth by the trial court in this case. Again, the court expressed its concerns as to the security measures that historically had been placed with DHS. To reiterate, we made inquiries as to whether or not any additional safety measures could be put in place for Mr. Davis. We took that step, and I think it was a drastic step. Ultimately, the answer that we got from DHS was that there was nothing additional that they can do. They indicated, essentially, that it was not practical to make exceptions for individual cases. There was nothing above and beyond what they normally do that they'd be willing or able to do, for that matter, for this particular individual. And they expressed, again, that they believed that their typical protocol was sufficient. And again, it's worth emphasizing that historically, they had never had any problems, and I believe that that was made part of the record. Nonetheless, the trial court insisted on additional safety protocols and safety measures and refused to grant any past privileges, unless and until such increased security practices were put in place. Essentially, we are asking that the trial court enter an order allowing for those increased past privileges while Mr. Davis is a resident at the Elgin Mental Health Facility. The standard of review is manifest way to the evidence. Thank you, Mr. Strzelecki. Mr. Leonard? May it please the court, counsel. The defense counsel has accurately stated the facts. It's the defendant's burden at this hearing to prove by a preponderance of the evidence that he should be given this conditional pass. The trial judge is the one who must balance the defendant's interest in progress in his treatment against the safety of the defendant and others. The trial judge was very concerned about the lack of security with regard to visits outside of the facility. He ultimately denied the defendant's request because of this lack of security. Ms. Roy testified to what the security measures would be if Mr. Davis was taken in a pass to outpatient treatment. The defendant would wear civilian clothing, but he would have an ID card clipped to his shirt. The defendant would be handcuffed and transported to this outpatient facility, but the handcuffs would be taken off when he got out of the van and he would be walked into the outpatient facility. The security guards would then have to sit outside of the treatment room because of patient confidentiality. The security people that they do employ do not carry any weapons, tasers, or mace. She also testified that she wanted to give the defendant a conditional pass to go to the library and recreation center. In those situations, there would be no security personnel. It would be one recreational therapist who would take perhaps three of the inmates to the facilities while these facilities were open to the public. These recreational therapists were not allowed to restrain the inmates in any way. They had to call the police or the Elgin facility. Now the defendant asked that he be released on these conditional passes. However, the crimes that he allegedly committed are a serious factor that the trial judge gave consideration to, along with the lack of security. The trial judge ultimately found that balancing the defendant's interest with the safety of the public, that he could not grant the conditional pass on these conditions in lack of security. You correctly stated that the standard of review is manifest error in this case. A judgment is against the manifest way of the evidence if the opposite conclusion is apparent, or the findings are unreasonable, arbitrary, or not based on the evidence. Let me ask you this. There's two different kinds of passes, right? The library pass and the one for the outpatient treatment. Let's talk about outpatient treatment. What evidence in the record suggests that allowing this would render a danger to anybody? I mean an absolute danger. There's always a danger, right? Yes. The standard has reasonably assured the defendant's progress and the safety of the defendant. What evidence suggests that allowing the pass for the outpatient treatment would create an unreasonable risk of danger to anybody? Well, based on the defendant's past history of committing these armed violence and armed robbery, where there were actually gunshots fired during this, and because the security guards would actually be sitting outside of the treatment room. Do you think it would be safe to say that we can assume that there's no firearms inside the treatment room? Yes, it would be safe to say, but we don't know what's inside the treatment room. There could be an exit where the defendant could leave without the security officers knowing about it. The defendant could flee from the security personnel. I agree with all the... That could happen, but when we talk about reasonableness, does the testimony that no patient had ever done that before, does that meditate one way or another toward the reasonableness of a fear that this fellow's going to flee the premises through some other back door or window out of the treatment room? The trial judge was aware of this, and his response was, there's always a first time. And if that's the standard he uses, who's ever going to get to go to outpatient treatment? Well, he would be agreeable to outpatient treatment if there were further security measures put in place. He denied the conditional pass because he believed that it was a danger to the public based on the security... He believed that there should be more security. Otherwise, he was agreeable to allowing these passes. I know it says that they took a recess or a break so that they could check about additional security measures. What did he ask for? He did not ask for anything specifically. He just asked if... Well, he denied the pass at this initial stage, and then they had a re-hearing, and he allowed them to present evidence of more security. And the response from the Elgin Mental Health Center was, these are our security measures, and we're not going to change those measures. Mr. Leonard, there were six years of treatment? Yes, he was five years of treatment. He was admitted for treatment on May 16, 2006. And the final order in this case was November 30, 2011. So he has had at least five years of treatment, six years of treatment by now. And all of the testimony that was before the court was that he had been fully compliant with that treatment, that he had fully complied with the medication protocol, and that he was doing well. But considering the defendant's criminal background and the lack of security, I don't believe that this court could say that it's unreasonable, arbitrary, or not based on the evidence. Well, doesn't it seem as though, in essence, what the trial judge is saying is you need to guarantee, ensure, that this guy can't get away. And is that a reasonable standard to apply to these situations? Because, first of all, nobody can guarantee people are going to be safe in the courthouse in which he rendered his order. And no matter how much security, you've got places full of felons and their friends and people standing trial. But does the fact that there's risk, does that make it unreasonably dangerous? And I think that if the court's standard is you've got to have security that will guarantee the safety of everybody around and the safety of this defendant, is that an appropriate standard in light of, it just says reasonably assure the safety of the defendant and others. And it seems to me that if he applies a standard as you've got to guarantee that nothing's going to happen, well, nobody can make that guarantee. No, he never said that you have to guarantee that nothing would happen. He did not say what security that Elgin had to provide before he would grant this conditional pass. Which just makes it even tougher, right? Go get some more security. Well, here we've got some more. Well, that's not enough either. Well, what do you want us to do, Judge? I don't know, but I'll know when I see it. And how do you run a system like that? Yeah, that was the trial judge's decision that what they provided for security was not sufficient. And he did not say what would be sufficient. Is there a difference at all between, like I say, these two passes from the state's standpoint anyway? I'll ask Mr. Strezlecki about this when he talks to us again in a minute. But do these two passes stand and rise on their own, or is it a package deal? No, they're separate. I believe the trial judge could grant outpatient pass without granting the recreational pass. The outpatient pass, there is more security there. In the recreational pass, there is no security there. But considering the defendant's criminal history, the trial judge believed that this amount of security was insufficient, and he did not indicate what would be sufficient. Would it have been unreasonable for the trial judge, in your opinion, to have said, look, I'm going to allow the outpatient treatment plan and then come back in six months or a year or whatever after that's been gone, we'll see how that's gone, and if that's gone fine, come back again with your request for the library pass. Would that have been an unreasonable approach to take? It would not have been unreasonable, but the trial judge still felt strongly that there needed to be more security, and I would tend to agree with the trial judge. There seems to be no security, or very little security, at least in the outpatient treatment setting. I can empathize with the defendant here, but the Elgin Mental Health Center needs to provide security to protect not only the defendant, but also the public. I'm sorry, you certainly answered my question. Yes, I'd ask that this court grant the trial judge's decision. Okay, thank you, Mr. Strezlacki. Your Honor, I think it's worth pointing out that the trial court in this case expressed not only the philosophy that there was a first time for everything, but the court even likened this situation to the historical moment when the space shuttle blew up. And I believe that what the trial court in that instance was trying to get across was that, well, something eventually did go wrong, so basically we have to count on something going wrong in the future. And obviously that's not a realistic or practical approach that can be taken. And certainly, as I believe Your Honor has already suggested, Mr. Davis cannot be put in a situation where he has to prove beyond any doubt whatsoever that there is a guarantee that nothing will ever go wrong in the future. Nobody has the ability to make that type of prediction. To pick up on a point that was brought out as to the differences between the types of passes, I suppose certainly the trial court would have the authority, if it saw fit to do so, to issue one pass and not the other, or to perhaps take an approach such as the one that you had suggested. However, I would also point out that there was nothing suggested by either of the witnesses that would indicate that they saw any particular reason to differentiate between the two passes. Nonetheless, again, I believe that the inherent authority does exist to make that differentiation. Well, wasn't there a different level of security on the two different passes? The library pass, wasn't that really less security than the outpatient treatment pass? To an extent, I would agree that that's the case. I do believe that with the treatment, there did appear to be a little closer watch, if you will, taking place. My understanding of the situation was that the people accompanying Mr. Davis to the treatment would be right outside the door, and Mr. Davis would be essentially in a room with only the treatment providers. In fact, that was out of necessity because of the desire to keep the treatment process confidential. As to the library, obviously there wasn't quite the concern about the confidentiality of anything going on, but they nonetheless felt that that was an appropriate type of pass to grant to Mr. Davis, and again, they thought that that would be beneficial to him insofar as it would help him ultimately continue on and make progress. So I do believe, to a certain degree, to the extent that they were not positioned right outside the door, there was some difference in the level of security. And also, I suppose the fact that Mr. Davis would be in a presumably larger room in closer proximity to other members of the public, I suppose to that extent there would have been a difference as well. Nonetheless, again, both Ms. Roy and Dr. Hussain felt that this would be the most appropriate step for him to take, and they again expressed that historically, during the course of his treatment, he had posed no threat. And in fact, they both indicated very strongly that their knowledge of him and their contact with him indicated that he was somebody who was nothing but obedient, polite, quiet, and in no way threatening to anybody. Are you concluded? Judge, I would only just suggest to the Court that in this type of situation, DHS, it's an agency of the state, and they're certainly aware of their potential for liability. They've been doing this for quite some time. The evidence is that the security protocols that have been placed have been there for quite some time, and they've been successful historically. There's no reason that they should be deviated from in this particular case, and to require such deviation would be most unreasonable. We believe that the trial court's ruling in this case was inerrant, and we respectfully ask that you enter into order directing them to grant the past privileges as requested. Okay, no questions. Thank you both for your arguments here this afternoon. This matter will be taken under advisement. A written disposition will be issued. Right now, the Court will adjourn until next year. Court is now adjourned.